Mr. Bartholomew? Yes. Good morning. Good morning. If it pleases the Court, my name is Gregory Bartholomew. I represent the appellant. A little cooler here than home, huh? It's too cold, if I may proceed. Your Honor, the government has urged that this is not a prosecution involving a person for the mere possession of explosive components. But a trial, when you look at the evidence, when you look at the record, they primarily relied and emphasized two things. It was appellant's possession of explosive components and his knowledge of how to use those components. From there, the government basically asked the jury to make an assumption that it had to be him who had made those destructive devices. So the crux of this appeal is that they failed to present evidence of a nexus connecting appellant to the destructive devices that were found on the property. And then on his property. Yes, sir. There were six devices that were found inside the home, and there had been one further to one other device that was found in another area on the property. And then, of course, there had been not one but two explosions on the property. Well, wasn't there a considerable emphasis on how long it might take to string all that together? Because he hadn't been gone from the house very long. Yes, there was emphasis on that. And, in fact, there were a core set of facts that included his daily routine, basically leaving every morning at about 530 to meet with his son, spend that two-hour period at a coffee shop. And that two-hour period was essential to both sides of the courtroom in terms of the presentation that was made. But that was, in addition to that, however, you also, it was pretty much undisputed. He lived on the property. He lived there alone. He had a shed where he stored his tools and the explosives that he had used when he had been doing mining work and farming work and that kind of stuff years earlier. He definitely had knowledge of explosives. But the routine, I think, was very, very important. Still, that routine didn't bring forth or didn't establish anything having to do with knowledge that he had those destructive devices. There was no evidence of knowledge. And that was essential for proving the case. Are you saying that you can never prove this crime through the use of only circumstantial evidence? Is that what your argument boils down to? No. I'm not saying that at all. But I think circumstantial evidence has to show that the person is somehow connected to the explosives. There has to be a rational, reasonable link. We don't see the link here. An argument that it had to have been him, we, that's why we're here, we're urging that that doesn't cut it. That's why we made the argument that if we had something such as motive, some reason for why he would have done this, I think that would have bridged it. But we don't have that. We don't have that at all. And we are talking about someone who was 75 at the time, and we're talking about everything he owned and losing everything he owned and putting his own life at risk without an explanation for why the whole argument doesn't make any sense. And I think the jury was entitled to have some information because that's too big a gap to ignore. If we look at the cases from the circuits, the Oba case or the Pedersen case, for example, there you have defendants who were fiddling around with components and made destructive devices, but they had reasons, not logical reasons, but they had reasons. They didn't like their county in Washington in one case. They didn't like the city of Oregon in another. They had targets. So there's a connection. There's a nexus. In our case, we don't have that. We don't have motive. We don't have targets. And we don't have to lead into, we don't have any incriminating statements at all either. This was a gentleman that was taken into custody. He was interrogated by experienced law enforcement officers. And all he kept repeating to them was, I don't know what you're talking about. And he denied that he had knowledge of these devices. And he answered their questions as best he could. Kennedy Admit ownership of some of the components? The ownership of the components is not in question. I don't even, that was not disputed at the trial. But again. Everything but the coffee can, right? Well, the thing is that this wasn't just putting together components. This also had the element of the shrapnel, which made it a destructive device. That shrapnel had absolutely no commercial use. And that's why he was indicted for possession of a destructive device and not necessarily for making one. If we get into, for example, the sequence again of that day, his leaving to meet his son for that two hour period. The government did urge, Judge, that it was not possible for someone to put those devices together unless they had the level of experience with explosives that Mr. Shuler had. But from our perspective, that's not the only way to look at it. Because what that really means is that there's a two hour window of opportunity for one or more other people with experience to put those devices together. Your argument just made is that there's another way to make an inference from the proof at trial. That's correct. That leads one down to reasonable doubt. Yes. But the cases tell us that we have to view the evidence and the light most favorable to the prosecution they prevailed in this case. And isn't it entirely reasonable to string all these things together and come to the fair inference that he knowingly possessed these devices? We don't believe that that is possible in this case because you've got essentially the government trying to present a line of evidence, but then you've got these tremendous valleys and gaps in things that are missing, which we don't believe a rational trier of fact could have found beyond a reasonable doubt with regards to the charge that this man faced. And certainly, if we look at this sequence again, this two hour period, if you were, if our position makes sense, which we believe it does, then somebody else may have done this thing. And certainly the government's assumption that it was not possible to make it within that two hour period, that fails. Give us your best example of the largest gap in the evidence that no inference could leap. The largest gap in the evidence has to do with the fact that this man never re-entered his home. There is no proof that he ever re-entered his home after he went to meet his son at 5.30 that morning. He was on the property at the time of the explosion, but from the interview that the agents conducted, he was taking care of his fish. He was tending to the rental property because he had a separate unit on the property at the time of the explosion, the first explosion. Before the second explosion, he ran towards the shed, and that one went off, and that's when he got hurt. So you have no evidence that he ever re-entered, and that's crucial because the government had a witness, an agent testify, that these devices that were in the house were in plain view. And therefore, he had to have seen them. But if he never re-entered, and there's no evidence before the jury that he ever re-entered, then that whole concept, that whole theory, that's nothing more than an assumption without any substance whatsoever, and it was unreasonable for the jury to rely on it. So if he didn't re-enter, he didn't see it. How do you explain the dynamite found, or the dynamite residue found on the handkerchief? There was testimony that when you are in an area where dynamite is stored, that particular type of residue is essentially gases. It can come into contact with you onto your clothes, onto the handkerchief, just by being in the room. It was stored in a shed where he kept his tools, and I don't think it was disputed that he used his tools. I mean, he basically lived his life taking care of his property. So there is testimony that it could have come from that type of contact. Do you want to save a little time for rebuttal? I would. Thank you for your argument, counsel. We'll hear from the government at this time. Was there evidence that these devices were set with timers, or were they trip wires, or was there any evidence with them? May it please the Court, and Judge Canby, the evidence at trial was that these circuit breakers and strung together with wires. There was no evidence presented that these devices were capable of being set by remote detonation. Furthermore, the government would argue that even if it were possible to set them by remote detonation, it would be an incredible coincidence that exactly at the moment that the defendant entered that shed and placed himself in the position of greatest exposure, someone from outside the property could see that and remain unobserved in a residential area in Prescott Valley in the early morning hours, at this time, around 730 to 8 o'clock in the morning. I'd like to go from an offer proof as to technically how these devices were set off. Your Honor, the government did not offer proof as to how those devices were set off. Nor did the government, as the defense notes, point out a motive in this case. It's not always possible in a case to present either a motive if there — If I just wondered if there was somewhere in the record a description of technically how it occurred, a surge in an electric line, whatever. There was none, Your Honor. Okay. There was evidence that's not part of what was submitted to the Court as to how these devices could go off. But for the purposes of this appeal, we'll focus on what's in front of the Court. Well, are you saying it's in the record but not in the excerpt? That is correct, Your Honor. And if it would help the Court, we can present that as a supplement to this panel. If we need it, we'll ask. Thank you, Your Honor. I'd like to focus in my time on the intent and nexus argument, then on the gap in the evidence that the defendant proffers, and finally, on the complementary forensic evidence in this case. The government urges that there is no intent requirement in a possession of an explosive device case, and that talking about a nexus is just a backdoor way of trying to get to intent. It's important to recognize that the jury was clearly instructed in this case by the Court in a special instruction on the record that the jury could not find the defendant guilty just because the bombs were on his property. They also had to find that he knew that the bombs were there, and that followed into the possession instruction. Unlike in Peterson, cited by the defense, these were bombs, not components, technically defined as mines. And the jury knew that because they saw the evidence of the shrapnel and the trajectory of the bombs that went off. The explosions corroborate the fact that they're bombs, and as a result, the motive or the intent that the defendant has is not relevant to this inquiry. Nexus is also a funny term to use in this context. It's more akin to a jurisdictional argument, whether someone has a connection sufficient to be sued in a particular jurisdiction. A hypothetical involving a firearm possession case might be appropriate here. If one felon gives another felon a firearm that's traveled through interstate commerce and says, guard this for me, that second felon is possessing under the law that firearm unlawfully, if he has it for the day, regardless of whether he had any deep-set connection to the gun in the past or any intent to use the gun in the present or the future. And so for those reasons, the government believes that in this case it's the possession, the knowledge of its existence with the power and intention to control it or the physical control of it that serves the purpose of the inquiry. Well, I think the defendant is taking the position that if someone else came in and took the firearm in Coffey, then he didn't possess it. And, Your Honor, the government That's what I mean by no nexus, that you do have to, well, as you say, give him knowledge or notice or something, knowledge plus some sort of time to reject the possession. And if I can focus on that timing, then, the largest gap in the evidence that the defendant talks about is the fact that there is no evidence that the defendant entered his home in the hour and a half, after the hour and a half to two hour gap in which he was out for coffee. The government submits that that fact is not really a relevant one to the inquiry. The key fact is that the defendant says, when I left that morning, there was nothing in that house. He says that in the interview with Agent Hildik. So in the hour and a half to two hours that he was gone, even if the court adds the  defendant's speculative version would be irrational. A third party would have had to believe, would have had to enter the property, find in the garage the dynamite, the prills, the shrapnel, take those partly to the shed, partly to the upper residence, go into the upper residence through these security cameras, multiple cameras that the defendant talks about in his interview, link up the wires and spread them throughout the house, tie them with the mining hitch, find the cans, either find cans in the garage or clank up to the house through the residential neighborhood in the early morning hours with these tin cans, all without observation. And under these circumstances, the government contends that that is not even a rational opposite view or alternate view of this case, and furthermore, that it doesn't detract from the government theory. Was it clear from the evidence that the components actually did come from the shed, or are they just like ones that were in the shed? It's clear from the evidence, Your Honor, that the shrapnel came from the shed. Those concrete – I'm sorry. It's clear from the evidence that they came from the garage. We believe that ER 100 and 103 describes more particularly that the components were stored in the garage, the garage that blew up, so that there was no evidence of those anymore, but that the dynamite came from the garage and the blasting caps were also stored in the garage, consistent with what was there, and that the shrapnel, most importantly, was from the garage, and one piece of shrapnel was identified by the defendant in the interview as having previously been stored in that garage. Now, of course, the other thing that was stored in the garage is the dynamite in this case. And it's the presence of the dynamite in the garage and the residue on the defendant's handkerchief that the government contends is further corroboration of his presence of his possession of those bombs, notwithstanding the fact that the dynamite was stored in the garage. Some of the tools were in a shed. It was the garage that blew up and went into the neighbor's property, Mr. Flippen, who observed him, and it was the shed in the front of that rental property where some of the tools were stored. The shed also had a mine or destructive device in it, which is why the government contends that a third-party intruder would have had to go into the garage, take some to the shed, and take the remainder up to the house. It's undisputed that the residue on the hankie comes from close proximity to pre-explosion dynamite. The government contends that its view of the evidence supports the inference that the defendant was touching the gummy dynamite when he was cutting it in half, and therefore, that's how it got onto the handkerchief. It is, of course, possible that the residue got on the handkerchief from non-touching close proximity, simply walking around the garage near the box of dynamite. The problem with that is that the jury was instructed to consider the sufficiency or consider the evidence in light of all of the evidence in the case, and the defendant's The defendant tells Agent Hildick, sure, I had that dynamite on ER 105. I had the dynamite, but I last used it 10 to 12 years ago, and since then, I've neither seen nor thought about that dynamite. That statement, which the jury heard, is highly unlikely with respect to residue still remaining after not having seen or thought about that dynamite for 10 or 12 years, and this gives the jury a reason to disbelieve that statement of the defendant. And so for these reasons, the government believes that the jury can focus on the circumstantial evidence in this case. The defendant's experience and ownership of the dynamite is perhaps not as important a factor as some of the others, but his presence on the property is important. The timing, the limited time to construct this device, and the presence of the defendant exactly at the moment of impact, combined with his actions and character. His son says that he's paranoid, and the security cameras may corroborate that. He's an old-fashioned guy that keeps things locked up, says the bowling alley friend. He leaves the site after his house is blown up, and he doesn't even tell his son that his house blew up until later in the day. And finally, the absence of any observed third parties and the testimony of the witness who shortly after the second explosion observed just one person running around, Mr. Shuler, supports the fact that it's rational that the defendant knew the devices were there and that he knew the devices were bombs. And for that reason, the government urges the Court to uphold the conviction. Thank you for your argument, counsel. Rebuttal. Yes, thank you. Very, very briefly, I don't believe the government means to imply that the security cameras were operational. I don't believe there was any evidence with regards to them being so. With regards to not seeing any dynamite, it misses the point. The dynamite was in the same shed as the tools. This gentleman did nothing but work on his property. He had rental property, which he maintained. He used tools. He went into the shed. So I don't think that that's necessarily a significant point. With regards to being on the property, it's his property. He can be there whenever he wants. He can be outside, inside. It's his property. And the fact that he's there is inconsequential. With regards to leaving the site after the explosion, all I can tell this Court is that it's clear and undisputed he was injured after the explosion. He was treated by medical personnel. He walked away. He had head injuries. He had a chest injury. A friend found him at the same place because apparently he walked over to the bowling alley, which he would frequent. And then from there, he was taken to the hospital. So the fact that he didn't remain or didn't act as a rational person after sustaining injuries, I don't think it's as significant as the government would ask the Court to make it. Finally, I would, well, almost finally, there's the physical impossibility factor. This is a residential neighborhood. And nobody, there's no witnesses to show that this 75-year-old man with physical problems carried any heavy shrapnel, as was testified to, into the house, who knows how many times, without being seen. There's no evidence. That's a major gap. And that should have been explained to the jury. It was not. And since the review is de novo, we would ask the Court to look at the entire picture here, and we would ask for a reversal of this conviction. Thank you, counsel. Thank both counsel for your argument. The case just argued will be submitted for decision.
judges: Canby, Thompson, Hawkins